IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KIM M. COOK,

                    Petitioner,

    vs.

WILLIAM LAPINSKAS, Superintendent,
Spring Creek Correctional Center,[1]

               Respondent.

No. 3:14-cv-00002-JKS

MEMORANDUM DECISION


      Kim M. Cook, a state prisoner now represented by counsel, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Cook is in the custody of the

Alaska Department of Corrections and incarcerated at Spring Creek Correctional Center.

Respondent has answered, and Cook has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

      Cook was charged with first-degree murder for shooting a state trooper who was

performing a routine welfare check. On direct appeal of his conviction, the Alaska Court of

Appeals laid out the following facts underlying the charges against Cook:

        In the early morning of May 15, 1999, Palmer Police Officer James Rowland was

---

[1]     William Lapinskas is substituted for L. Dean Marshall as Superintendent, Spring
Creek Correctional Center. FED. R. CIV. P. 25(d).

on patrol, accompanied by a civilian "ride-along." This civilian was Todd Russell, a fireman and EMT, who was Rowland's longtime friend. Rowland and Russell noticed a pickup truck parked near the entrance to the Carrs grocery parking lot. The vehicle's windows were fogged up, and it appeared that someone was slumped over the steering wheel. Rowland parked behind this truck and gave his dispatcher the license plate number. The dispatcher informed Rowland that the owner of the truck was Kim Michael Cook, and that Cook's driver's license and vehicle registration had both expired.

While Russell sat in the patrol car, Rowland approached the truck and knocked on the window. The occupant, who was indeed Cook, opened the door and got out of the truck. Rowland and Cook went to the back of the truck and conversed for a few minutes. Then, when Rowland reached for his handcuffs, Cook turned and ran toward the driver's-side door of the pickup. Rowland caught up with Cook and wrapped his arms around him. The two men struggled, and their efforts carried them inside the cab of the truck.

As Russell watched the two men fight, he heard a popping sound, then two more slightly louder popping sounds. These were three gunshots. Rowland fell to his knees and then collapsed outside the truck. Russell used the patrol car radio to summon an ambulance. At about the same time, Cook got out of the truck, staggered for a bit, and then lay down on the ground.

Rowland had been shot once in his upper chest. He bled to death. Cook had been shot twice in his chest, but he survived and was charged with first-degree murder.

*Cook v. State*, No. A-7947, 2004 WL 719771, at *1 (Alaska Ct. App. Mar. 31, 2004).

On May 27, 1999, Hallie Rowland, Officer Rowland's widow and the personal representative of his estate filed in the Alaska Superior Court a wrongful death lawsuit against Cook seeking compensatory and punitive damages. When Cook appeared at a criminal arraignment the following day, he was served with the complaint, but he failed to answer it within 20 days as required by Alaska law. Rowland then applied for entry of Cook's default.

Three days after the default was entered, Rowland requested a hearing to establish damages for the default judgment. She subsequently withdrew the request and proposed that the court enter a default judgment without a hearing. Rowland calculated her total compensatory damages at $1,753,975, and requested an award of punitive damages of three times that amount, or $5,261,925. The Superior Court accepted Rowland's request and entered a total default judgment of $7,015,900, against Cook on June 28, 1999.

On July 21, Cook responded to the civil suit for the first time by moving to set aside the entry of default and the default judgment. The court set a hearing for two weeks later and ultimately denied Cook's motion to set aside the default judgment.

-2-

As a result of the court's denial, Cook was unable to use his assets to retain private counsel to represent him in the criminal case. Cook appealed the superior court's decision to not set aside the default judgment against him. While that appeal was pending, the criminal case against Cook proceeded, and a public defender was appointed to represent Cook in the criminal case.

On the fifth day of trial, Cook told the trial judge that he was dissatisfied with his appointed counsel and wanted to be appointed co-counsel. The judge directed Cook and his attorney to discuss the issue over the weekend and, if necessary, renew the application on the following Monday. On that Monday, Cook's counsel informed the court that the disagreement had not been resolved, and Cook asked to fire his appointed counsel. Cook requested another appointed attorney, but stated that he would represent himself with an advisor if the judge rejected his request for another attorney. After further discussions with the court, Cook asked that the court to relegate his appointed counsel to advisor status and allow Cook to represent himself. The court discussed with Cook the benefits of counsel and the dangers of self-representation. After examining Cook about his request, the judge found that Cook knowingly, intelligently, and voluntarily waived his right to counsel. From that point on, Cook represented himself at trial with the consultation of his former attorneys. Cook was subsequently convicted of first-degree murder.

Almost two years after Cook's conviction, the Alaska Supreme Court held that the superior court abused its discretion in refusing to set aside the default judgment against Cook because it did not recognize the difficulties Cook faced in timely responding to the civil complaint. *Cook v. Rowland*, 49 P.3d 262, 264-67 (Alaska 2002). Cook then filed a petition for post-conviction relief from his murder conviction, arguing that the error in the civil case amounted to a deprivation of Cook's Sixth Amendment right to choice of counsel in his criminal case. The Superior Court granted the petition, and the Alaska Court of Appeals reversed. *State v. Cook*, 265 P.3d 342 (Alaska Ct. App. 2011). Cook petitioned the Alaska Supreme Court for

-3-

hearing, which was granted. On November 18, 2013, the Supreme Court affirmed the Court of Appeal's denial in a divided order dismissing the petition for review as improvidently granted. *Cook v. State*, 312 P.3d 1072 (Alaska 2013).

Cook then filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on December 23, 2013, the timeliness of which Respondent does not contest. Docket No. 1. His request for appointed counsel was granted, and an Amended Petition (Docket No. 15 "Petition") was subsequently filed. The Petition is now before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Cook argues that the state court violated his Sixth Amendment right to the counsel in two ways. First, Cook avers that he was deprived of counsel of his choice when the court erroneously limited his access to his personal assets. He additionally contends that the trial court erred in allowing Cook to represent himself at trial because Cook did not unequivocally waive his right to counsel.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon

-4-

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

A.    Deprivation of Right to Counsel of Choice

Cook first argues that his Sixth Amendment right to counsel of choice was violated when the superior court erroneously refused to set aside the default judgment entered against him in the civil case, which limited his ability to retain counsel of choice in his criminal proceedings.

-5-

In the last reasoned decision addressing this claim, a divided Alaska Supreme Court considered and rejected the claim on post-conviction review as follows:[2]

Almost two years after Cook was convicted of murder, we held that the superior court erred in the civil case by failing to recognize the difficulties Cook faced in responding timely to the civil complaint and refusing to set aside the default judgement. The error we identified did not include any failure by the superior court to take Cook's Sixth Amendment rights into account when it denied his motion to set aside the default judgement. Cook then filed a petition for post-conviction relief from his murder conviction, arguing that Judge Cutler's error in the civil case amounted to a deprivation of his Sixth Amendment right to choice of counsel. Superior Court Judge Eric Smith granted the petition for post-conviction relief and set aside Cook's murder conviction. The court of appeals reversed. Cook petitioned for hearing, and we granted the petition. We are now faced with the narrow question whether the decision in the civil appeal reversing the denial of the motion to set aside the default judgement is a new fact under AS 12.72.010(4) that "requires vacation of the [criminal] conviction or sentence in the interest of justice."

[] A criminal defendant has a right under the Sixth Amendment to the United States Constitution and article I, section 11 of the Alaska Constitution to counsel of his choice. This right is not absolute. The defendant has no right to insist on representation by an attorney that he cannot afford. Nor does he have a right to spend assets that have been lawfully seized or frozen in a separate proceeding, even if those assets are necessary to retain the attorney of his choice. The United States Supreme Court has stated that "the essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."

In *Cook v. Rowland*, we concluded that Judge Cutler erred in failing to recognize Cook's difficulty in responding timely to the civil suit to be excusable neglect when she refused to set aside the default judgement against Cook in the civil case. This error may have had the collateral consequence of depriving Cook of the funds necessary to hire the private counsel of his choice. But there is no evidence that either the State prosecutor or Judge Cutler had any intent to interfere with Cooks ability to hire private counsel or to deprive him of his Sixth Amendment rights. Indeed, Judge Smith quoted Judge Torrisi's earlier finding that the State had not intentionally tried to restrict Cook's choice of counsel: "[I]t is absolutely clear that the State was not trying to prevent Mr. Cook from hiring private counsel. In fact, they were doing the exact opposite." As Judge Torrisi noted, the State was actually "trying to make sure [Cook] hired [private counsel] if he

---

[2]    In conducting review of a state court decision, federal courts "look to the last reasoned state-court decision." *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003). In this case, the Alaska Supreme Court did not issue a formal opinion affirming the Court of Appeals' denial of post-conviction relief, but rather issued an order dismissing as improvidently granted its earlier-granted petition for review. *Cook*, 312 P.2d 1072. Because the Supreme Court provided a reasoned explanation for its decision that addressed the merits of Cook's claim, it appears that its order is the last reasoned state-court decision in this case. But even if that assumption is incorrect, the Court of Appeals' decision, which would then be the last-reasoned state court decision, is predominantly consistent with the Supreme Court's order, and this Court's analysis in this opinion applies equally to both determinations.

-6-

had that much money."[13]  Cook does not challenge this factual finding.  Nor is there any evidence that Judge Cutler acted with intent to violate Cook's Sixth Amendment rights. Judge Smith made no such finding, and the court of appeals concluded that restriction of Cook's choice of counsel "was not the point" of Judge Cutler's refusal to set aside the default judgement and observed that there was no evidence in the record that she considered Cook's ability to hire the counsel of his choice when she made her decision. Cook does not dispute this conclusion.  Indeed, Cook argues that intent is immaterial and that he should be granted a new trial on Sixth Amendment grounds "regardless of [Judge Cutler's] motives."  It is unsurprising that Judge Cutler would not have considered any Sixth Amendment implications of her default judgement ruling given that Cook did little or nothing to flag the issue in the civil case.  Although Cook asserted that the entry of default made it impossible for him to hire an attorney in the civil case, he never asserted in the civil case that he could not afford an attorney in the criminal case.  And Cook never argued to Judge Cutler that her refusal to set aside the default judgement violated his Sixth Amendment rights in the criminal case.[15]  Nor did he appeal Judge Cutler's denial of his motion to set aside the default judgement on Sixth Amendment grounds. The question, then, is whether an incidental error in a separate civil case, detected years later on appeal and unintentionally affecting a criminal defendant's ability to hire the counsel of his choice, is enough to overturn an otherwise valid conviction in the criminal case and order a new trial on Sixth Amendment grounds.

> FN13.  Judge Torrisi made this finding in his decision denying Cook's motion to continue the criminal case for prosecutorial misconduct.

> FN15.  The dissent argues that this court's opinion in *Armstrong v. Tanaka*, 228 P.3d 79 (Alaska 2010), should have compelled the superior court to "expressly consider" and balance Cook's Sixth Amendment rights against other interests when deciding Cook's motion.  But Armstrong involved a distinct question, and our holding in that case is inapposite.  There, we held that "when the plaintiff in a civil case is simultaneously defending himself in a related criminal case, and he moves to stay civil proceedings to protect his right against self-incrimination, the trial court must balance both parties' interests."  *Id.* at 80 (emphasis added).  Unlike the criminal defendant in Armstrong, Cook never argued to Judge Cutler that refusing to set aside the default judgement would impair his Sixth Amendment rights in the related criminal case.  Thus, the dissent applies Armstrong beyond its predicate when it asserts that "Armstrong at a minimum requires" that "the judge consider [ ] the defendant's constitutional rights."

The United States Supreme Court has generally rejected the idea that civil actions that collaterally affect a defendant's financial condition—and thus his ability to afford the attorney of his choice in a separate criminal case—violate the Sixth Amendment right to choice of counsel.  In *Caplin & Drysdale, Chartered v. United States*, the Court held that the Sixth Amendment right to counsel does not prevent a criminal defendant's assets from being seized in a related civil case, even if that seizure prevents the defendant from hiring the attorney of his choice in the criminal case.  In *Caplin*, a criminal defendant was charged with running a massive drug importation and distribution scheme.  The government sought to seize the proceeds from this enterprise under the federal drug forfeiture statute.  The government obtained a restraining order barring the defendant from transferring his potentially forfeitable assets.  Despite the order, the defendant paid a law firm $25,000 to represent him.  The defendant pleaded guilty in the criminal case, and the court seized virtually all of his assets.  The law firm petitioned the court to

-7-

adjudicate the firm's rights to the funds.  After concluding that the federal forfeiture statute did not permit the defendant to use the contested funds to pay his attorneys, the Court concluded that the statute did not violate the defendant's Sixth Amendment rights.  The Court reasoned that the governmental interest in obtaining full recovery trumped the defendant's Sixth Amendment interest in using the contested assets to pay for his defense.  "A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice."

[] The dissent objects to our reliance on the fact that neither Judge Cutler nor the State had any intent to interfere with Cook's exercise of his Sixth Amendment rights.  The dissent maintains that it is "unaware of any authority . . . [stating] that a constitutional deprivation in the trial courts is without remedy unless the State or the court specifically intended that the constitution be violated."  But there is nothing new or improper about finding a constitutional deprivation only when the court intended to effect a deprivation.  For example, the United States Supreme Court famously held in *Batson v. Kentucky* that "[p]urposeful racial discrimination in selection of the [jury] venire violates a defendant's right to equal protection" but otherwise reaffirmed the general principle that the discriminatory impact of facially neutral practices in jury selection is not a violation of the Equal Protection Clause.  Indeed, as state actors, courts are often subject to the same motive inquiries that define prohibited state action more generally.  Motive is the determinative factor in many doctrines of constitutional law, and motive is especially relevant in this case:  Unlike the dissent, our reliance on motive draws a clear line between prohibited and permissible state action.  Every state action involving a person's money will foreseeably have an impact on that person's exercise of a constitutionally protected right, yet we do not require state actors to sua sponte balance those incidental impacts against other concerns in all such cases.

[] Neither Cook nor the dissent cites any precedent for reopening a settled criminal case on Sixth Amendment grounds merely because, years later, an error was detected on appeal in a concurrent civil case that may have prevented the criminal defendant from accessing some of his assets.  The cases Cook cites that have found Sixth Amendment violations are completely distinguishable because in those cases an order was issued in the criminal case itself that prevented the defendant's chosen attorney from participating in the criminal proceeding.  But in *Bell v. Todd*, the Tennessee Court of Appeals held that an erroneously entered default judgement in a related but separate civil case did not implicate a criminal defendant's Sixth Amendment rights because "[t]he right to retain counsel does not carry with it an entitlement to funds that have been sequestered by a court to secure the interests of a claimant or the public."

[] We agree with the court of appeals that under Cook's view of this issue, any judg[ment] directing a person to pay damages for a breach of contract, or to pay back taxes and penalties, or even to pay a fine as punishment for an unrelated crime, would be deemed an abridgement of that person's Sixth Amendment right to counsel of choice in a pending criminal case if (1) the person was forced to satisfy the judg[ment] (or, at least, forced to sequester funds to pay the judg[ment] ), and (2) the person's lack of funds prevented the person from hiring a private attorney in the criminal case, or at least the particular private attorney the person would otherwise have chosen, and then (3) the money judg[ment] was later overturned because of a procedural error, or a mistaken evidentiary ruling, or an improper jury instruction.

[] We conclude that finding a constitutional violation in such a case would subject the finality of criminal convictions to events outside the control of the judge or the parties to the criminal case.  Here, the State was not a party to the civil suit and had no means of detecting or preventing reversible error in that case.  Nor would a judge presiding over a criminal case have the power to protect against error in a related civil suit handled by a

-8-

different judge.

[] Cook argues that the rule he proposes can be limited to the unique circumstances of his case. In particular, Cook argues that a constitutional error may be found in this case because the civil and criminal proceedings were closely related. But we see no principled way to protect the finality of criminal convictions by limiting this case to its facts. The fact that the same judge presided over both the civil and criminal proceedings for a period of time in this case is irrelevant to Cook's broader legal argument that he was deprived of his Sixth Amendment rights. Under Cook's argument, a judge commits constitutional error as a state actor whenever an error in the civil case restricts a party's ability to hire his preferred attorney, regardless of who presides over the criminal case. Nor is the fact that the civil and criminal trials in this case stemmed from the same alleged act pertinent to Cook's constitutional analysis. The subject matter of the civil or criminal case cannot possibly be relevant to the question whether an error in the civil case has limited a criminal defendant's ability to hire the attorney of his choice. The only relevant issue is whether that error prevented the defendant from accessing his funds. Under Cook'' constitutional interpretation, any such error in a civil case—closely related or not—would violate a defendant's Sixth Amendment rights in the criminal case if it prevented the defendant from accessing the funds necessary to hire the attorney of his choice. Therefore, although the civil and criminal cases happened to arise out of the same conduct by Cook and were briefly before the same judge in this case, those facts are not a useful way to distinguish future cases. If we conclude that the error in the civil case violated Cook's Sixth Amendment rights we must also conclude, as the court of appeals did, that "a criminal defendant's Sixth Amendment rights would be violated by any judg[ment] or order in any proceeding if that judg [ment] or order deprived the defendant of the funds necessary to hire a private attorney in a pending criminal case, and if the judg[ment] or order was later overturned for any reason in a subsequent appeal, or in a motion for relief from judg[ment]."

[] Although the dissent predicts that the "unusual facts of this case" will be "unlikely to arise again," the logic of the dissent's proposed rule would extend far beyond its factual predicate. The U.S. Supreme Court recognized this line-drawing problem and cited it as support for its holding in *Caplin*, asking rhetorically:

> If defendants have a right to spend forfeitable assets on attorney's fees, why not on exercises of the right to speak, practice one's religion, or travel? . . . The full exercise of these rights, too, depends in part on one's financial wherewithal; and forfeiture . . . may similarly prevent a defendant from enjoying these rights as fully as he might otherwise. Nonetheless, we are not about to recognize an antiforfeiture exception for the exercise of each such right; nor does one exist for the exercise of the Sixth Amendment rights.

Similarly, in the present case, if a defendant has a right to have a court weigh, sua sponte, the effects of a civil judgement on the defendant's ability to procure a lawyer of his choice in a parallel criminal case presided over by the same judge, then why not in a non-parallel case or one presided over by a different judge? Moreover, why would entering judgement in any civil matter without considering the effect of the judgement on the losing party's ability to exercise any constitutionally protected right not impermissibly burden that right? Finding no principled stopping point for such a sua sponte duty on state actors to consider incidental burdens on constitutional rights, we prefer the improper-motive inquiry announced in this order. It adequately protects against unconstitutional penalties sought by intentional bad actors without presenting intractable line-drawing problems.

[] Therefore, the Petition for Hearing, filed on January 18, 2012 and granted on

-9-

June 5, 2012, is **DISMISSED** as improvidently granted.

*Cook*, 312 P.3d at 1073-77 (citations omitted).[3]

Two of the five justices dissented, concluding that the superior court's denial in the civil case of Kim's access to the funds he needed to retain counsel in the criminal proceedings constituted structural error warranting a new trial. *Id.* at 1078-90. Cook now asserts that the majority's determination was unreasonable and contrary to federal law, thus warranting federal

---

[3]     Cook moved for post-conviction relief in the Alaska state courts under Alaska Rule of Criminal Procedure Rule 35.1(4), which provides that a defendant may move for post-conviction relief if "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice." Notably, Cook did not move for post-conviction relief under Rule 35.1(a)(1), which refers to a conviction or sentence in violation of the U.S. or Alaska constitution. The Supreme Court thus construed the question before it very narrowly: "whether the decision in the civil appeal reversing the denial of the motion to set aside the default judgement is a new fact under AS 12.72.010(4) that 'requires vacation of the [criminal] conviction or sentence in the interest of justice.'" *Cook*, 312 P.3d at 1072.

This procedural posture, which relates solely to an issue of state law, begs the question of whether this Court has jurisdiction to consider on federal habeas review Cook's Sixth Amendment claim. In order to exhaust state remedies, a petitioner must present the substance of his claim to the state courts. *See Picard v. Connor*, 404 U.S. 270, 278 (1971). The state courts have been given a sufficient opportunity to hear an issue when the petitioner has presented the state court with the issue's factual and legal basis. *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999); *see also Scott v. Schriro*, 567 F.3d 573, 582-83 (9th Cir. 2009) ("Full and fair presentation additionally requires a petitioner to present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief."). Exhaustion is satisfied once the petitioner makes an explicit reference to federal law, even if the petitioner relies predominantly on state law before the state courts. *See Jones v. Smith*, 231 F.3d 1227, 1231 (9th Cir. 2000). A claim not alleged in a state petition may be exhausted if "sufficiently related" to an exhausted claim. *See Lounsbury v. Thompson*, 374 F.3d 785, 788 (9th Cir. 2004). Likewise, once the petitioner fairly presents the claim to the state courts, exhaustion is satisfied even if the state court's decision is silent on the particular claim. *See Dye v. Hofbauer*, 546 U.S. 1, 3, (2005) (per curiam).

Here, Cook explicitly referenced his Sixth Amendment right to counsel and alleged facts contending that his right to counsel of choice was violated by the trial court's failure to set aside the default judgment. Given that the analysis of his claim of new evidence of material facts rested on his contention that his Sixth Amendment rights had been violated, it appears that Cook fairly presented his Sixth Amendment claim to the state courts, and this Court may consider it on its merits.

-10-

habeas relief.

The Sixth Amendment right to counsel guarantees to an accused the concomitant rights to conflict-free representation and the effective assistance of counsel. *See Wheat v. United States*, 486 U.S. 153, 156 (1988); *Strickland*, 466 U.S. at 686. It also includes a right to counsel of choice for those who can hire their own attorney. *See Wheat*, 486 U.S. at 159. However, although the right to counsel is absolute, the right to choice of counsel is limited or qualified. *Id.* ("[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."); *see also Luis v. United States*, 136 S. Ct. 1083, 1089 (2016) (plurality). "A defendant has not right, for example, to an attorney who is not a member of the bar, or who has a conflict of interest due to a relationship with the opposing party." *Luis*, 136 S. Ct. at 1089 (citation omitted). Notably, "[a] defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that the defendant will be able to retain the attorney of his choice." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989). In particular, where funds are in a defendant's possession unlawfully, the defendant's Sixth Amendment right to counsel of his choice is not violated when those funds are seized and the defendant is precluded from using those funds to retain defense counsel in criminal proceedings. *Id.*

Here, Cook's Sixth Amendment argument arises from the default judgment entered against him in a civil case that, although it involved the same underlying facts, was otherwise separate and unrelated to the criminal proceedings. In support of his claim, Cook largely relies on *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). In that case, the Supreme Court held that "erroneous deprivation of the right to choice of counsel, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error." *Id.* at 150 (internal quotations omitted). But *Gonzalez-Lopez* is distinguishable from Cook's case

-11-

because in that case, the trial court deprived the defendant of his right to counsel in the instant criminal proceeding by erroneously refusing to admit as counsel of record in that case Gonzalez-Lopez's choice of retained attorney. *Id.* As the Alaska Supreme Court explained, the superior court's actions in the unrelated civil case against Cook had the ancillary effect of hampering Cook's ability to retain counsel in the criminal proceedings. Thus, it cannot be said that *Gonzalez-Lopez* constitutes clearly-established law on the facts of Cook's claim. *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable).

For the same reasons, cases finding a violation of the right to counsel of choice due to the Government's pretrial restraint of a defendant's asserts are likewise distinguishable and unable to provide the basis for federal habeas relief in this case. *See, e.g.*, *Luis*, 136 S. Ct. at 1083, 1088 (holding in a plurality opinion "that the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment"). In those line of cases, the Government sought forfeiture in the criminal proceeding based upon a federal statute. As another district court has explained, assets obtained from an unrelated civil proceeding "are distinctly different from asserts frozen under criminal statutes." *United States v. Johnson*, No. 2:11-cr-501, 2016 WL 4087351, at *3 (D. Utah July 28, 2016) (finding "no Sixth Amendment violation when Johnson was denied access to funds to hire an attorney when the funds were held by the receiver pursuant to court order in a civil case in another jurisdiction"). In the absence of clearly established Supreme Court law directly supporting Cook's contention that a private party's restraint of a criminal defendant's untainted assets in a civil action implicates the Sixth Amendment choice of counsel in a criminal prosecution, Cook cannot obtain federal habeas relief. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (citations and internal quotations omitted); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear

-12-

answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law") (citation, internal brackets and quotations omitted).

Cook also devotes much of the Amended Petition to addressing the actions of the prosecutor and the judge in the civil case other than those related to the erroneous denial of his motion to set aside the default judgment in an attempt to establish other erroneous or unjustified state action in support of his claim.[4] He contends that "the justice system as a whole prevented Cook from being represented by the attorney of his choice." For example, Cook avers that the prosecutor publicly filed Cook's confidential financial information in the criminal case to argue that Cook was not entitled to the appointment of counsel, which was later sealed, but not before the attorney for the Estate used the documents "to freeze as many of Cook's assets as he could find." Cook additionally alleged that Judge Cutler moved the civil case "at a suspiciously quick pace."

Cook faults the decision of the Alaska Supreme Court for focusing on the superior court and Court of Appeal's factual findings that neither the prosecutor nor Judge Cutler acted with the intent of preventing Cook from retaining private counsel because the denial of the right to counsel is structural without regard to intent, *Gonzalez-Lopez*, 548 U.S. at 149-50. But the state courts' finding that none of those other state actions had the effect of violating Cook's right to

---

[4]     Respondent argues that, to the extent Cook challenges state actions other than the denial of his motion to set aside the default judgment, Cook has failed to exhaust such claim in the state courts. According to Respondent, because Cook did not raise his denial-of-counsel-of-choice claim on direct appeal, he was limited to seeking post-conviction relief solely on the ground that the reversal of Judge Cutler's decision refusing to set aside the default judgment in the civil case constituted new evidence warranting a new criminal trial. The State thus contends that Cook may raise Judge Cutler's erroneous refusal to set aside the default judgment as the sole ground for support of his denial of choice claim in these proceedings. In his merits brief, Cook argues that he was unable to raise the claim on direct appeal because it involved the erroneous ruling in the civil case and that if the State's position were correct, that would render it impossible to properly litigate his claim in full. Because the facts of his denial-of-counsel-of-choice claim were outside the record of his criminal case, it appears that Cook correctly argues that it would not have been proper to raise the claim on direct appeal. The Court therefore declines to address the claim solely on exhaustion grounds.

-13-

counsel in the criminal proceeding is nonetheless a factual finding entitled to this Court's deference. Cook fails to demonstrate that the factual finding is unreasonable. In any event, Cook has not shown under any clearly established federal law that the effects of those other actions violated his right to counsel of choice. Cook is not entitled to relief on any argument advanced in support of this claim.

B.    Erroneous Grant of Self-Representation

Cook additionally contends that the trial court erred in allowing him to represent himself at trial. In the last reasoned opinion addressing this claim, the Alaska Court of Appeals considered and rejected this claim on direct appeal as follows:

> Prior to Cook's trial, and for the first four days of the trial, Cook was represented by the Public Defender Agency. In fact, two assistant public defenders were assigned to his case. But on the fifth day of trial (Friday, October 20, 2000), Cook and his two attorneys asked to speak to Judge Torrisi privately (i.e., ex parte). At this ex parte hearing, Cook told the judge that he was dissatisfied with his lawyers and that he wanted to assume the role of co-counsel.
>
> The crux of the problem, according to Cook, was that he believed that the State had manufactured ballistics evidence against him, but his attorneys refused to pursue this claim of falsified evidence at trial. Cook's defense attorneys responded that they had considered Cook's claim, but they concluded that the purported inconsistencies in the ballistics evidence could be explained. The attorneys told Judge Torrisi that, in their opinion, it would be a mistake for the defense to raise a claim of manufactured evidence because "[they] would lose all [their] credibility in front of the jury".
>
> After hearing from both Cook and his attorneys, Judge Torrisi directed them to discuss their differences over the weekend, and he invited Cook to raise the issue again on Monday if Cook still wished to pursue the matter.
>
> On Monday morning, the defense attorneys informed Judge Torrisi that they had discussed trial strategy with Cook over the weekend, and the upshot was that Cook and the attorneys "basically [had] two mutually exclusive theories of the case", so that the decision regarding trial strategy "[could not] be dealt with in a [co-operative] manner". In other words, the issue could not be resolved by making Cook co-counsel, because Cook's proposed trial strategy and the attorneys' trial strategy could not be reconciled. Cook then told Judge Torrisi that he wanted to fire his public defenders. The following colloquy ensued:
>
> *The Court*: And what do you want to do?
>
> *Cook*: ... [M]y first choice would be to have an appointed attorney. If that's rejected, then I'll represent myself with an advisor.
>
> *The Court*: Well, what would an appointed attorney do at this stage of the proceedings? I mean, ... the State's case is two days from being finished....
>
> *Cook*: Well, then, I'll represent myself with-the case law says [that] I'm entitled

-14-

to advisors. So I'd like a different advisor appointed [for] me.... And if that's not possible, then I can keep-my second option would be to keep these guys [*i.e.*, Cook's two current public defenders] as advisors. But [with the understanding that] I can either accept or reject their advice.

Judge Torrisi immediately sought to dissuade Cook from taking the lead in his own defense. The judge told Cook that his two attorneys had "shown an ability to cross-examine [witnesses] and ask appropriate questions", and they had also demonstrated the ability "to do those subtle things that make a jury tend to want to believe [the defense view of things]". The judge cautioned Cook that a defendant who represents himself "starts off with a credibility problem, [regardless of] whether he's innocent or guilty, because the jury [perceives that] he's got an interest in the case". Finally, Judge Torrisi told Cook that defense lawyers are trained to "do little things to build credibility, to ask questions that chip away at the edge[s] [of the government's case] without necessarily calling somebody a liar, ... [to use] other little techniques that are very difficult ... for a person [to do] for himself". Judge Torrisi warned Cook that "if you give that up, [you] are giving up a lot".

Cook replied, "I feel like they're helping me to lose ...; and if I'm going to lose, I might as well do it by myself, on my own. If they were there to help me win, that would be a different matter."

Judge Torrisi then asked Cook:

*The Court*: So what would you have [your attorneys] do? You would have them sit there, ... so you could ask them a question if you had [one], but otherwise you would be your [own] lawyer?

*Cook*: Yeah.

At this point, Cook's attorneys told Judge Torrisi that, based on their legal research, such a procedure would not be possible unless Cook first validly waived his right to counsel (because Cook would become, in effect, the lead counsel for the defense).

After a few minutes' more discussion about the trial strategies proposed by Cook and his lawyers, and how these strategies were irreconcilable, Judge Torrisi summoned the prosecutors to court so that Cook could publicly affirm his desire to represent himself, with the assistance of advisory counsel. Cook was placed under oath, and the following exchange occurred:

*The Court*: Mr. Cook, is it true that you want to represent yourself in this proceeding?

*Cook*: Yes.... Well, let me rephrase that. I would like [to have] competent counsel. But since I won't be appointed competent counsel, then the next alternative is to represent myself.

*The Court* [to the prosecutors]: [T]he defendant is contending ..., and [defense] counsel agrees, that the trial strateg[ies] of counsel and Mr. Cook [differ by] 180 degrees at this point.

[To the defendant]: And that's true, Mr. Cook, from your point of view?

*Cook*: That's true; yes.

-15-

*The Court*: The Court has told you in private, and I'll tell you again, that it appears to me [that] your counsel are competent [and] well-prepared, and [that they] have investigated various possibilities. You have the right to have an attorney. You [in fact] have two of them. And are you asking that they be relegated to advisor status at this point?

*Cook*: Yes.

*The Court*: So that you would actually conduct the cross-examination of witnesses and put on your own ... ?

*Cook*: Yes, because that's the only way I can control what questions are being asked. Because [my attorneys] are not going to do what I want them to do.

*The Court*: ... You've never done anything like this before, I take it?

*Cook*: No; it will be an experiment.

*The Court*: There are people who get through law school and still can't do [what you propose to do]. It's not an easy skill to ask questions, especially to cross-examine, do you understand [that]?

*Cook*: I imagine, yes.

*The Court*: ... As I [listened] to the cross-examinations that have been done [so far in this trial], [I] could see little points get ticked away that-obviously, some thought, some planning went into [them]. You haven't been doing that thought; you haven't been [doing] that planning. And you don't have experience in doing it. It strikes [me] that you're almost certainly going to make large mistakes. Do you recognize that?

*Cook*: Yeah.

At this point, the prosecutors asked Judge Torrisi for a recess so that they could consider the situation-in particular, so that they could assess the validity of Cook's waiver of counsel. Judge Torrisi granted the recess.

When the parties re-assembled in court approximately two hours later, Judge Torrisi continued his questioning of Cook. Judge Torrisi reminded Cook that Cook had no experience with criminal trials-in particular, no experience with filing legal motions and no knowledge of the rules governing what evidence could be introduced at trial and what evidence was prohibited. The judge warned Cook that these subjects were taught at law school in semester-long courses, so Cook should not expect to learn them over the next several days.

The judge also cautioned Cook that lawyers provide other benefits to their clients: they can present a client in a favorable light, and argue the client's side of the case, without seeming to be self-serving; they can evaluate potential defenses; they can negotiate on the client's behalf without subjecting the client to the risk of self-incrimination; they can prepare defense witnesses for their testimony in court; and they know how to preserve an objection to trial court errors so that these errors can be pursued on appeal. Cook told Judge Torrisi that he thought he understood all of this.

Judge Torrisi reminded Cook that he had the "absolute right" to appointed

counsel, and the judge again expressed the opinion that Cook was making a mistake by deciding to represent himself.

Finally, Judge Torrisi warned Cook that, in addition to the issues he had already mentioned, there would be jury instructions to be drafted, and it was possible that technical legal issues might arise as to what constituted a defense to the charge of murder. Cook said that he understood this, and that his attorneys could advise him on these matters. Judge Torrisi then asked again:

> *The Court*: So ... you want ... to represent yourself and have [your current attorneys] available for advice?
>
> *Cook*: Yes.
>
> *The Court* [to the defense attorneys]: And counsel, you're willing to [perform] that role?
>
> *Asst. Public Defender Davenport*: Well, Your Honor, a purely consultative role is the most that we would be willing to do. We would not participate in examining witnesses, [or] making arguments to the court or to the jury.... [A]s far as consulting, we're willing to do that, but we're not willing to share strategy or participate in the trial unless we're in charge.
>
> *The Court*: You would give Mr. Cook your ideas, but not [interact with] counsel and the court?
>
> *Davenport*: He would have to implement [the] ideas that we give him. It would be up to him to do it all.
>
> *The Court* [to the defendant]: Well, I think it's pretty clear that somebody has to be the [lead] lawyer here, and it's either the public defenders or it's you. And you're asking that it be you, is that right, Mr. Cook?
>
> *Cook*: Yes.

Based on the foregoing, Judge Torrisi found that Cook had made a knowing and voluntary decision to represent himself-that is, a decision to assume personal responsibility for selecting a trial strategy and for conducting the trial (the presentation of both evidence and arguments), on the condition that the public defenders would remain as his advisors.

On appeal, Cook argues that he never unequivocally expressed his desire to represent himself or to undertake the lead role in the presentation of his defense. Cook points out that, at least twice, he told Judge Torrisi that he had decided to represent himself only because he was convinced that his two public defenders were incompetent and because he could not get another court-appointed attorney to replace those public defenders.

But Judge Torrisi repeatedly told Cook that he saw no evidence that Cook's public defenders were incompetent. And, in the absence of proof that Cook's current attorneys were incompetent, Cook had no right to demand another court-appointed attorney.

Thus, Cook's choices were to represent himself or to continue with his public defender representation. Judge Torrisi engaged in thorough and repeated explanations of the benefits of counsel and the disadvantages of representing oneself in criminal

proceedings. The judge expressly told Cook that he thought Cook was making a mistake. As shown by the above-quoted excerpts of the proceedings, Cook acknowledged that he understood all of this, but he nevertheless persisted in his desire to assume the lead role in his defense (provided that his public defenders remained available to give him advice).

Cook's choice may have been "conditional" in the sense that he preferred another alternative-the appointment of a new attorney at public expense to replace his public defenders. But that alternative was not legally available to him. Within the range of choices that were legally available, Cook's decision was unequivocal. There was no ambiguity in Cook's waiver of his right to counsel.4

In his reply brief, Cook raises a new argument as to why his waiver of counsel was invalid. Cook relies on a decision of the Ninth Circuit: *United States v. Kienenberger*, 13 F.3d 1354 (9th Cir. 1993). Cook suggests that the Ninth Circuit's holding in *Kienenberger* means that a criminal defendant's waiver of counsel is never "unequivocal" for purposes of the Sixth Amendment if the defendant at the same time requests the assistance of advisory counsel. *See id.* at 1356.

We do not reach the merits of this contention because it is raised for the first time in Cook's reply brief.

Finally, Cook contends that, even though he premised his waiver of counsel on the expectation that he would receive advice from his public defenders throughout the remainder of the trial, he never received any help from them.

Four days after he waived his right to counsel, Cook did indeed complain to Judge Torrisi that his public defenders were giving him no advice. But the record indicates otherwise.

At several points in the record, there are notations of "whispered conversations". Some of these whispered conversations are expressly linked to discussions between Cook and his public defenders. Other whispered conversations occur in a context which strongly suggests that Cook is consulting the public defenders.

For example, at page 1133 of the transcript, the prosecutor objects to one of Cook's questions. Following a whispered conversation, Cook rephrases the question. The same thing happens later at pages 1607-08. Similarly, at page 1183, Cook objects to the fact that the State has called his stepmother as a witness. Following a whispered conversation, Cook rephrases his objection, now arguing that the State should be prohibited from calling his stepmother until the State's rebuttal case, because she is being offered as a character witness.

Again, at page 1344, during a discussion of anticipated defense witnesses, Cook tells Judge Torrisi that he (Cook) will let his public defenders announce who the defense witnesses will be. When Judge Torrisi replies that Cook must do all of the talking for the defense, a whispered conversation ensues, and then Cook announces the witnesses.

The discussion of jury instructions is replete with whispered conversations, strongly suggesting that the public defenders are explaining to Cook how to argue the various issues relating to the jury instructions. In fact, at page 1746, one of the public defenders directly addresses the court to explain Cook's objection to a jury instruction.

And, finally, we note that Cook asked Judge Torrisi to notify his public defenders directly if the court received any questions from the jurors during their deliberations (pages 1845-46 of the transcript).

In short, the record does not support Cook's assertion that the public defenders sat with him in the courtroom but declined to help him in any way.

For all of these reasons, we uphold Cook's waiver of his right to counsel.

*Cook v. State*, No. A-7947, 2004 WL 719771, at *4-8 (citations omitted).

The right to counsel guaranteed by the Sixth Amendment "has been interpreted to

-18-

encompass 'an independent constitutional right' of the accused to represent himself at trial, and thus waive the right to counsel." *Stenson v. Lambert*, 504 F.3d 873, 882 (9th Cir. 2007) (quoting *Faretta*, 422 U.S. at 806). Such waiver, however, must be "knowing, voluntary, and intelligent." *Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004). While no specific colloquy is required, *Lopez v. Thompson*, 202 F.3d 1110, 1117 (9th Cir. 2000) (en banc), the Ninth Circuit has "gleaned a three-factor test from *Faretta*, under which in order to deem a defendant's *Faretta* waiver knowing and intelligent, the district court must insure that he understands 1) the nature of the charges against him, 2) the possible penalties, and 3) the dangers and disadvantages of self-representation," *United States v. Forrester*, 512 F.3d 500, 506 (9th Cir. 2008) (citation and internal quotation marks and brackets omitted). "The preferred procedure to ensure that a waiver is knowingly and intelligently made is for the district court to discuss each of the three elements with the defendant in open court," although a trial court's failure to do so "will not necessitate automatic reversal when the record as a whole reveals a knowing and intelligent waiver." *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir. 1987).

In his Petition, Cook does not argue that his *Faretta* waiver was unknowingly made, and the record provides no support for such assertion. Rather, he claims that his waiver was not unequivocal because Cook twice told the trial judge that he decided to represent himself only because he could not get another court-appointed attorney to replace his public defenders. But "there is no authority for the proposition that [a defendant] is entitled to an absolutely unconditional choice between exercising his right to counsel and his right to self-representation." *United States v. Robinson*, 913 F.2d 712, 715 (9th Cir. 1990). In *Robinson*, the Ninth Circuit addressed a defendant's argument on direct appeal of his conviction that he was coerced into self-representation "as a result of . . . being faced with the implicit choice of retaining [an] attorney . . ., with whom he had apparently had some tactical and strategy disagreements, and

-19-

proceeding pro se."[5] *Id.* at 715-16. The Ninth Circuit concluded that "limitations on the range

of a defendant's free choice with regard to appointed or retained counsel are not constitutionally

offensive and do not render a subsequent election of pro se status involuntary." *Id.* at 716.

Here, Cook claimed that his attorneys were incompetent, and the Ninth Circuit has made

an exception in the case of incompetent counsel. *See Schell v. Witek*, 218 F.3d 1017, 1026 (9th

Cir. 2000) (reasoning that, where a defendant is left with the choice of only incompetent counsel,

he is "improperly left with no counsel at all"). In *Schell*, the Ninth Circuit remanded to the

---

        [5]        The Sixth Amendment right to counsel guarantees to an accused the concomitant
rights to conflict-free representation and the effective assistance of counsel. *See Wheat v. United
States*, 486 U.S. 153, 156 (1988); *Strickland v. Washington*, 466 U.S. 668, 686 (1984). These
rights may be infringed if an accused and his counsel become embroiled in an "irreconcilable
conflict." *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("[F]orcing a defendant to
go to trial with an attorney with whom he has an irreconcilable conflict amounts to constructive
denial of the Sixth Amendment right to counsel." (citing *Brown v. Craven*, 424 F.2d 1166, 1170
(9th Cir. 1970) ("[T]o compel one charged with [a] grievous crime to undergo a trial with the
assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to
deprive him of the effective assistance of any counsel whatsoever.")); *see also Daniels v.
Woodford*, 428 F.3d 1181, 1197 (9th Cir. 2005).
        However, "not every conflict or disagreement between the defendant and counsel
implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en
banc) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)). The Sixth Amendment does not
require or guarantee, implicitly or otherwise, that an attorney-client relationship be "meaningful"
or free of discord. *Morris*, 461 U.S. at 13-14; *see Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th
Cir. 2008) (en banc) ("[Petitioner] has cited no Supreme Court case—and we are not aware of
any—that stands for the proposition that the Sixth Amendment is violated when a defendant is
represented by a lawyer free of actual conflicts, but with whom the defendant refuses to
cooperate because of dislike or distrust."). Rather, an asserted conflict crosses the constitutional
threshold "only where there is a complete breakdown in communication between the attorney
and client, and the breakdown prevents effective assistance of counsel." *Stenson*, 504 F.3d at
886 (citing *Schell*, 218 F.3d at 1026); *see also Daniels*, 428 F.3d at 1197 (the nature and extent
of the conflict must be such as to "deprive[] the defendant of representation guaranteed by the
Sixth Amendment." (citing *Schell*, 218 F.3d at 1027)). As the Court of Appeal noted, the record
"strongly suggests" that he had numerous discussions with his advisory attorneys through the
remainder of the trial and therefore belies any contention of a complete breakdown in
communication. *Cook*, 2004 WL 719771, at *8. Moreover, the record indicates that Cook
clashed with his attorneys primarily over litigation strategy. "Disagreements over strategical or
tactical decisions do not rise to level of a complete breakdown in communication." *Stenson*, 504
F.3d at 886 (citing *Schell*, 218 F.3d at 1026).

district court for an evidentiary hearing because "*no* court, either state or federal, ha[d] ever adequately looked into the merits of the substance of [the petitioner's] serious allegations." *Id.* at 1027. An evidentiary hearing is inappropriate here, however, because the record reflects that the trial court allowed Cook an opportunity to address his concerns, and considered those arguments before concluding that counsel was effective. The state court's finding was reasonable and fully consistent with the record. Thus, because Cook does not argue that the trial court erred by failing to substitute counsel and, indeed, the record does not demonstrate such error, Cook cannot show that the trial court's limitation of counsel rendered his waiver of the right to counsel involuntary.

Cook also claims that his waiver of the right to counsel was equivocal under the Ninth Circuit authority of *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994). In *Kienenberger*, the appellant informed the court that he was dissatisfied with his second appointed attorney and requested that he be allowed to represent himself with the assistance of advisory counsel. *Id.* The Ninth Circuit held that a defendant does not have a constitutional right "to represent himself and have access to 'advisory' or 'consultative' counsel at trial," and also concluded that because the appellant's request to represent himself was accompanied by his insistence that the court appoint advisory or standby counsel, "Kienenberger never relinquished his right to be represented by counsel at trial." *Id.* The Ninth Circuit found that Keinenberger was not denied his constitutional right to represent himself because his waiver was equivocal.

Cook contends that, under this authority, a defendant who agrees to self-representation only with the assistance of advisory counsel does not unequivocally waive his right to counsel even where advisory counsel is appointed. But Cook points to no clearly established authority of the U.S. Supreme Court that would directly compel such conclusion. In the absence of any clearly established federal law on this issue, AEDPA relief is foreclosed. *See Carey*, 549 U.S. at 77. Moreover, it is illogical to conclude that a person who receives exactly what he unequivocally requests (self-representation with the assistance on advisory counsel) nonetheless

-21-

can never validly waive the right to counsel. For these reasons, Cook is not entitled to relief on this ground either.

<h3 style="text-align:center">V. CONCLUSION AND ORDER</h3>

Cook is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability with respect to Cook's claim that the superior court's error in refusing to set aside the default judgment against him amounted to a deprivation of his Sixth Amendment right to choice of counsel in his criminal case. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 13, 2018.

/s/ James K. Singleton, Jr.<br/>
JAMES K. SINGLETON, JR.<br/>
Senior United States District Judge